**NOT FOR PUBLICATION**                                        **[10]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LISA MCCAFFERY, | : | |
| | : | Civil Action No. 04-3702 (FLW) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, ET AL., | : | |
| | : | |
| Defendants. | : | |
| | : | |

APPEARANCES:

For Plaintiff:

MATTHEW R. MCCRINK
RICHARD MICHAEL KITRICK
MCCRINK, NELSON & KEHLER
475 ROUTE 73 NORTH
WEST BERLIN, NJ 08091


For Defendants:

PAUL A. BLAINE
OFFICE OF THE UNITED STATES ATTORNEY
CAMDEN FEDERAL BLDG & U.S. COURTHOUSE
401 MARKET STREET
4TH FLOOR
CAMDEN, NJ 08101

**WOLFSON, United States District Judge**

This is a negligence action brought under the Federal Tort Claims Act by Plaintiff Lisa

McCaffery ("Plaintiff" or "McCaffery") against Defendants, the United States of America, the

Department of Defense and the United States Army Corps, arising out of injuries Plaintiff

allegedly sustained as a passenger in a motor vehicle accident that occurred in the Pedricktown

Containment Facility ("PCF"), a dredge spoils disposal site owned and operated by the United States Army Corps of Engineers.  Defendants have filed a motion for summary judgment on the grounds that the Army Corps' choice not to improve the PCF's interior roads falls within the discretionary function exception to the Federal Tort Claims Act so as to immunize the United States from McCaffery's suit, and/or that the United States is immune pursuant to the New Jersey Landowners' Liability Act.  Plaintiff has opposed the motion on the merits and has also argued that the motion is premature pursuant to Fed. R. Civ. P. 56(f).  The Court has federal question jurisdiction under 28 U.S.C. §§ 1346(b), 2671.  For the reasons discussed below, Defendants' motion for summary judgment is granted.

## I.      BACKGROUND

The PCF

The Army Corps is responsible for conducting and managing river dredging projects throughout the United States. One such project is known as "the Delaware River, Philadelphia-to-the-Sea," which involves the continuous routine maintenance dredging of parts of the Delaware River.  Dredged material is deposited into upland containment facilities located adjacent to the waterway. The PCF, located in Pedricktown, New Jersey, is one such facility.  Olson Decl. ¶ 4.  It consists of approximately 1700 acres of undeveloped property with a system of unimproved internal dirt roads, dikes, berms, open drainage ditches, sluices and sluice gates. Id.

The PCF's last cycled use as an active dredge disposal site occurred at various times from 1998 to 2003, during which time more than nine million cubic yards of dredge spoils were deposited there. Id. ¶ 4.  Dredge materials that are being pumped from the riverbed to the site are

approximately 85% water and 15% solids.  This produces an exceedingly soggy fill material which over time is drained of its water content. Id. ¶¶ 5-6. There are dikes and berms throughout the PCF that aid in containing the dredge materials and in allowing the water to escape and return to the river through a system of open drainage ditches and sluices. During pumping and for a period afterward, the material is essentially like quicksand in its consistency. Id.  As the water drains, the dredged material dries, eventually leaving a firmer consistency to the ground on which it has been deposited. Typically, one year must pass after pumping has ceased, before the ground is able to support the heavy equipment that is then used in constructing the containment site. Id. ¶ 6.

The PCF has dirt roads around the containment dikes.  Id. ¶ 7.  These internal roads are intended for Army Corps and government contractor vehicles only in connection with dredge disposal and containment construction activities.  Id. ¶¶ 3, 7; Carpenter Decl. ¶¶ 2, 4; Am. Compl. ¶ 5.  Beyond the placement of stone and gravel on some of the roads in order to provide some surface stability for authorized vehicle usage, the roads are unimproved.  Olson Decl. ¶ 7; Carpenter Decl. ¶ 2.  According to the Army Corps, the road surfaces at the actual waste disposal sites, which are around the dikes and berms, are not improved in any manner because such improvements could interfere with the drainage process. Olson Decl. ¶ 7.

The Army Corps does not permit unauthorized private civilian vehicular traffic within the PCF.  Id.  ¶ 9.  The roads themselves are not designed or built to accommodate regular private use, because, according to the Army Corps, such use could lead to degradation in the ability of the dikes and berms to promote drainage of the dredge deposit areas, and to their physical alteration or destruction from having vehicle tires repeatedly digging into and driving over or alongside them. Id. ¶¶ 7, 9.  The interior roads are fully visible in the daylight hours.  Carpenter

Decl. ¶ 2.  These roadways possess no guard rails, traffic or warning signs, speed control devices,

or lighting.  Am. Compl. ¶ 6.  When dredge materials are pumped to the site, such pumping takes

place at all hours.  Carpenter Decl. ¶ 2.  Other than those times when dredge material is being

pumped to the site, Army Corps and contractor activities at the PCF take place only during

daylight work hours. Id.

The PCF is bordered to the east by U.S. Route 130, to the north by Oldmans Creek, to the

south by a wildlife preserve, and to the east by the banks of the Delaware River.  Olson Decl. ¶ 3.

Along the PCF's eastern boundary with US Route 130, a continuous fence and berm line has

been erected to prevent unauthorized entry.  Olson Decl. ¶ 8; Carpenter Decl. ¶ 4.  The fence and

berms are posted with warnings that trespassing is prohibited and that the property within is

dangerous.  Id.  Additional signs are erected that warn against unauthorized entry and advise that

various forms of activity are not permitted, such as hunting, fishing, parking, or the use of dirt

bikes or all terrain vehicles.  Id.

According to the Army Corps, the fence gates and entry points are kept locked or

barricaded at all times when not being used by Army Corps or contractor personnel. Olson Decl.

¶ 8; Carpenter Decl. ¶ 4.  The Army Corps maintains that on every workday the fence and gates

are inspected to make certain that their integrity has not been breached or compromised.

Carpenter Decl. ¶ 5.  When openings are found, they are immediately repaired or blocked  in

such manner as will be likely to prevent unauthorized entry into the facility.  Id. Frequently,

construction debris or left over on-site discarded materials are used to plug the holes in the

fencing as a means for preventing entry by unauthorized private vehicles or persons. Id.

According to the Army Corps, these materials are used as a cost savings measure, because there

is only limited funding available for these kinds of remedial preventative actions. Id.

4

Plaintiff

Plaintiff alleges that the PCF "was known as a location where local citizens including minors would gather to consum[e] ... alcoholic beverages and socialize." Am. Compl. ¶ 7. She alleges that a bon fire "pit was built on the property and used regularly for a period of years by local citizens," and that "boxes and tree parts" were arranged in front of and around the pit to provide seating to gatherers. Id. ¶ 8. One of Plaintiff's friends, Anthony Everwine ("Everwine"), avers that this area was called the "Party Spot," and that he had been there often to socialize and ride on an all terrain vehicle ("ATV"). Everwine Decl. ¶¶ 3-10. Indeed, Everwine declares that the property was openly used by dirt bike and ATV riders in plain view of dredging project workers. Id. ¶¶ 13-14.

On the evening of January 18, 2002 through the early morning hours of January 19, 2002, Plaintiff, then a sixteen-year-old minor, attended a party at the bon fire pit area of the PCF. Id. ¶¶ 10-11; Lisa McCaffery Decl. ¶ 2. She had never been there before. Id. At that time, the PCF was not an active dredge pumping site. Olson Decl. ¶ 4. Plaintiff declares that the "gated entrances to the area were open and the site was easily accessible" when she and her friends arrived. Lisa McCaffery Decl. ¶ 3. There were over thirty people at the "Party Spot" that night, and a bon fire was burning. Id. ¶¶ 6-8. At approximately 12:30 AM on January 19, 2002, Michael Shannon, an eighteen-year-old  was driving Plaintiff and Michael Tavner home from the party. Id. ¶ 10. While still on a dirt road within the PCF, Shannon lost control of the car, causing it to "roll down an embankment several times and eventually rest on its side." Am. Compl. ¶ 15. Plaintiff, a passenger in the vehicle, "suffered sever and permanent injuries including, but not limited to, a broken neck, collapsed lung, fractured rib, broken fibula and tibia, vein damage, severe head trauma resulting in neurological damage, significant scarring, and other permanent

injuries." Id. ¶ 15.

Although Plaintiff declares that the gates were open when she visited the PCF, according to John Carpenter ("Carpenter"), the Heavy Mobile Equipment Operations Supervisor at the PCF, the gate through which McCaffery and her friends entered the site been blocked by pipe and an abandoned vehicle on Friday, January 18, 2002, which was the last day of that work week at the PCF. Carpenter Decl. ¶ 6. After the accident, upon investigation, Carpenter maintains:

> [S]omeone had entered the PCF at some other location in a vehicle capable of traversing the unimproved roads inside the facility, and had managed to forcibly pull the abandoned vehicle away from its blocking position at the inactive construction gate. The abandoned vehicle was found angled away from the gate, at a point just wide enough to allow another vehicle or vehicles to enter. Deep tire gouges were visible in the dirt at the gate on the inside of the property, indicating that a vehicle had been used to pull the abandoned car from the gate entrance. Id. ¶ 7.

Procedural History

Plaintiff served a Federal Tort Claims Act Notice "Standard Form 95" on Defendants on October 15, 2003. Pl.'s Ex. G. On August 4, 2004, Plaintiff filed her complaint against Defendants, the United States of America, the Department of Defense, and the Army Corps, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346. Defendants initially filed their motion for summary judgment on April 8, 2005, and re-filed the motion on October 5, 2005.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To avoid summary judgment the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324.   A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (quoting Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999)).  Conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and a reasonable factfinder could rule in its favor.  Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).

### B.  Applicability of the Discretionary Function Exception

Plaintiff's suit against Defendants is a negligence claim.  She alleges that Defendants knew or should have known: 1) minors and others regularly gathered and consumed alcoholic beverages on the property, 2) there were prior accidents on the property which resulted in serious injury and death, 3) such prior accidents were a direct result of the dangerous and hazardous condition of the property, including but not limited to the rudimentary infrastructure of roadways that runs throughout the property, 4) the hazardous condition of the property and the hidden and apparent dangers contained therein, 5) the hazardous design and condition of the roadways on the property and the hidden and apparent dangers contained therein, and 6) that Defendants failed to protect persons including minors from the property's hidden and apparent dangers.  Am. Compl. Count I, ¶¶ 1-7.

Plaintiff's claim against Defendants the United States of America, the Department of Defense and the Army Corps is brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.  Defendants argue, though, that the Department of Defense and the Army Corps must be dismissed from the action, because the FTCA does not permit suit to be brought against federal agencies or departments in their own names.  Instead, they contend that United States itself is the only proper defendant in an FTCA action. This Court agrees. 28 U.S.C. §§ 1346(b)(1), 2674, 2679(a); Continental Ins. Co. of N.J. v. U.S., 335 F. Supp.2d 532, 535 (D.N.J. 2004) ("In an action brought pursuant to the FTCA, the United States is the only proper defendant."); McKenith v. United States, 771 F.Supp. 670, 673 (D.N.J.1991) (stating that the FTCA "does not provide this court with subject matter jurisdiction over any other defendant but the United States"); Dilg v. United States Postal Service, 635 F.Supp. 406, 407 (D.N.J.1985) (finding that the United States is the only proper defendant in an suit brought through the FTCA and that "[i]ndividual agencies ... may not be sued in their own name in such a case").  As such, the Department of Defense and the Army Corps are dismissed from this case.

The remaining claim is Plaintiff's FTCA claim against the United States.  As sovereign, the United States is immune from suit unless it consents. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994); Koss v. United States, 69 F.3d 705, 707 (3d Cir.1995). Congress, in passing the FTCA, waived the federal government's sovereign immunity for negligent torts committed by employees of the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."28 U.S.C. § 1346(b)(1).  In presenting a FTCA claim, a plaintiff must show: (1) that a duty was owed to him by a defendant; (2) a negligent breach of said duty; and (3) that the negligent breach was the proximate cause of the plaintiff's injury. Mahler v. United States, 196

8

F.Supp. 362, 364 (W.D. Pa.1961), aff'd, 306 F.2d 713 (3d Cir.), cert. denied, 371 U.S. 923

(1962). The federal government's waiver of immunity in the FTCA, however, includes several

exceptions. If an exception is applicable to this case then the court should dismiss the complaint

for lack of subject matter jurisdiction.  One exception to the FTCA, known as the discretionary

function exception, provides:

> Any claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not such
> statute or regulation be valid, or based upon the exercise or performance of the
> failure to exercise or perform a discretionary function or duty on the part of a
> federal agency or an employee of the Government, whether or not the discretion
> involved be abused. 28 U.S.C. § 2680(a).

By providing a discretionary function exception to the waiver of sovereign immunity,

Congress intended to protect certain governmental activities from exposure to suit by private

individuals. United States v. S.A. Empressa da Viacao Aero Rio Grandense (Varig Airlines), 467

U.S. 797, 808 (1984). The exception covers both government agencies and all government

employees exercising discretion. Id. at 813. A district court should consider several factors when

determining whether the exception is applicable to an FTCA claim.

First, the nature of the conduct alleged to be actionable is critical. Id. A court must

determine if the nature of the government employees' acts are of the nature that Congress

intended to shield from liability. Id. Second, a court should determine whether the conduct in

question involves the "discretionary acts of the Government acting in its role as a regulator of the

conduct of private individuals." Id. This second factor addresses Congress's concern that the

FTCA not become a tort cause of action used to "second-guess legislative and administrative

decisions grounded in social, economic, and political philosophy" so as to "seriously handicap

efficient government operations." Id. at 814 (citations omitted).

Using these factors the Supreme Court has crafted a two-part test for courts to apply to determine if the discretionary function exception applies. First, a court should consider the nature of the government employee's conduct and determine whether it involves an element of judgment or choice. United States v. Gaubert, 499 U.S. 315, 322 (1991); Berkovitz v. United States, 486 U.S. 531, 536 (1988). The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Id. Second, a court should consider whether the judgment is of the type that the FTCA exception is meant to encompass and designed to shield, that is, the actions are the result of "the permissible exercise of policy judgment." Id. at 537; see Gaubert, 499 U.S. at 323.  Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," Varig Airlines, 467 U.S. at 814, when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 537.

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. Gaubert, 499 U.S. at 324. Where a relevant governmental policy allows discretion, the Supreme Court has explicitly stated that for a complaint to avoid dismissal, "it must allege facts which would support a finding  that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Gaubert, 499 U.S. at 324-25.  The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325; see also

10

Cestonaro v. U.S., 211 F.3d 749, 753 (3d Cir. 2000); Sea-Land Serv. Inc. v. United States, 919

F.2d 888, 892 (3d Cir.1990).  Here, the United States contends that the Amry Corps' decision to

not improve the PCF's interior roads was a legitimate exercise of governmental discretion and

thus not actionable under the FTCA, depriving the Court of jurisdiction.

There is a developing jurisprudence setting forth boundaries of the exercise of agency

discretion.  At one end of the spectrum, several cases have found that agency decisions were

outside the ambit of appropriate discretion when an agency ignored obvious safety hazards that

could have been repaired through routine regular maintenance mandated by explicit policy.  For

example, in ARA Leisure Services v. United States, 831 F.2d 193 (9th Cir.1987), a tour bus went

off the road and rolled over a mountain pass in Denali Park, Alaska. Evidence showed that the

National Park Service had permitted a road, "which had edges so soft as to be dangerous," to

erode from an original width of 28 feet to 14.6 feet at the accident site. 831 F.2d at 195. Citing

Aslakson v. United States, 790 F.2d 688, 693 (8th Cir.1986), the court explained that the

discretionary function exception does not apply "[w]here the challenged governmental activity

involves safety considerations under an established policy rather than the balancing of competing

public policy considerations." ARA Leisure Serv., 831 F.2d at 195.

In Gotha v. United States, the Third Circuit, applying the Ninth Circuit's rationale, held

that the Navy did not function within the ambit of statutory agency discretion when it failed to

provide a handrail along a steep unlighted 20 feet long path where there was evidence that two or

three years before the accident the Navy had been asked to install a handrail and employees were

required to negotiate that path. Gotha v. United States, 115 F.3d 176, 181 (3d Cir.1997). The

court reasoned that the Navy was not entitled to the protection of the discretionary function

exception because the government failed to articulate a public policy rationale--military, social or

economic consideration--that factored into its decision not to rebuild the stairway or install a handrail. See id. at 181-82; see also Cestonaro, 211 F.3d at 757 (holding that because the National Park Service failed to show how providing some lighting, but not more, is grounded in policy objectives it was not protected by the discretionary function exception).  The Third Circuit rejected the government's attempt to characterize the decision not to take action as one of national security: "This case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." Id. at 181.

In Mitchell v. U.S., 225 F.3d 361 (3d Cir. 2000), the plaintiff sued the government as a result of her car crash on Route 209 within the Delaware Water Gap National Recreation Area that was maintained by the National Park Service.  According to the facts of that case, Mitchell was driving northbound when she tried to avoid an accident and ultimately drove off the paved roadway, entered a drainage ditch, struck a concrete head-wall of a culvert on the north end of the ditch, and sustained serious injuries. The head-wall, culvert and ditch were all approximately five feet from the near edge of paved road. Mitchell, 225 F.3d at 363.

The Third Circuit noted that in determining whether to commit funds for a complete reconstruction of Route 209, the government had to consider the ultimate purpose of the road, whether it would continue as a major commercial through-road or whether its use would be scaled back to serve principally as a recreational road.  Because the Park Service decided that it was desirable to turn Route 209 into a scenic parkway, Congress closed the road first to some and later to all non-park-related commercial traffic, and it allocated monies toward the construction of a bypass that would serve as an alternative to Route 209. However, Congress did not allocate funds for the complete reconstruction of the road itself.  Id. at 365-66.  In light of

these larger policy decisions, the Park Service was forced to determine priorities among the desirable improvements to the recently ceded Route 209. Major structural deficiencies, such as a rapidly deteriorating bridge, understandably were priorities. Among the roadside obstructions that were present all along the park's roads, the Park Service report noted that those within one or two feet of the road were of particular concern. Id. at 366.

Unlike the roadway in ARA Leisure Services, or the steep hillside lacking a guardrail in Gotha, the issue in Mitchell was a concrete culvert head-wall that was five feet west of the paved roadway that would only become dangerous to an operator of a vehicle if that person were driving northbound on a southbound lane and drove the vehicle five feet off the road in the wrong direction. The Park Service had to balance the costs of the repairs of every culvert head-wall along Route 209, along with the other safety issues identified in a 1986 study, against the low risk of an accident. From 1989 to 1993, Mitchell's accident was the only accident attributed to that area of Route 209. Id.

The court in Mitchell determined that, as distinguished from Gotha, the Park Service had articulated several policy considerations that were implicated in the its decision not to undertake a reconstruction of all drainage ditches along Route 209. Thus, the court found that the facts more closely resembled those of Cope v. Scott, 45 F.3d 445 (D.C. Cir.1995), a case in which the District of Columbia Circuit reached the conclusion that a failure to repair can fall under the discretionary function exception if it is based on a public policy rationale. Specifically, the Cope court determined that the Park Service's decision not to repave a particularly slippery stretch of the Rock Creek Parkway was protected. Cope, 45 F.3d at 451. The Cope court reasoned that "[d]etermining the appropriate course of action would require balancing factors such as [the road's] overall purpose, the allocation of funds among significant project demands, the safety of

13

drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards." Id.  Similarly, the Mitchell court ruled that its case fell in line with the major policy decisions at stake in Cope and not the "mundane, administrative, garden-variety, housekeeping problem" presented in Gotha, and thus ruled that the Service's decision to determine its repair and design priorities came within the discretionary function exception to the FTCA. Mitchell, 225 F.3d at 366.

      Finally, in Harrell v. U.S., 443 F.3d 1231, 1234 (10th Cir. 2006), a recent decision by the Tenth Circuit, Harrell sued the United States Coast Guard for serious injuries he sustained while tubing, when he struck a submerged buoy placed in the Missouri River by the Coast Guard. Harrell v. U.S., 443 F.3d 1231, 1234 (10th Cir. 2006).  Harrell argued that the Coast Guard should have placed a warning sign or marker at the buoy's location.  The Tenth Circuit ruled that the discretionary function exception applied because the "Coast Guard's decisions about the appropriate manner in which to warn the public about potential hazards relating to buoys are ... discretionary under the second prong [of Berkovitz-Gaubert], as those decisions implicate the exercise of a policy judgment of an economic nature, including the feasibility and costs of erecting and maintaining physical markers in light of available resources and the relative risks to the public health and safety from alternative actions."  Id. at 1239.

      Here, the United States argues that the Army Corps' choice not to improve the PCF's interior roads comes within the discretionary function exception to the Act so as to immunize the United States from McCaffery's suit. "[I]n applying the teachings of Gaubert, the inquiry becomes fact-specific."  Mitchell, 225 F.3d at 365.  A review of several statutes and the Containment Facility Management Plan for the area is appropriate for the analysis.

According to 33 U.S.C. § 1:

> It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department.  33 U.S.C. § 1.

33 U.S.C. § 540 provides:

> Federal investigations and improvements of rivers, harbors, and other waterways shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and the supervision of the Chief of Engineers.  33 U.S.C. § 540.

33 U.S.C. § 622(a), entitled "Contracts for dredging and related work," provides:

> The Secretary of the Army, acting through the Chief of Engineers (hereinafter referred to as the "Secretary"), in carrying out projects for improvement of rivers and harbors (other than surveys, estimates, and gagings) shall, by contract or otherwise, carry out such work in the manner most economical and advantageous to the United States. 33 U.S.C. § 622(a).

Section 148 of the Water Resources Development Act, United States Public Law 94-587,

codified at 33 U.S.C. § 419a, entitled "Management practices to extend capacity and useful life

of dredged material disposal areas," provides:

> The Secretary of the Army, acting through the Chief of Engineers, shall utilize and encourage the utilization of such management practices as he determines appropriate to extend the capacity and useful life of dredged material disposal areas such that the need for new dredged material disposal areas is kept to a minimum. Management practices authorized by this section shall include, but not be limited to, the construction of dikes, consolidation and dewatering of dredged material, and construction of drainage and outflow facilities. 33 U.S.C. § 419a.

The Containment Facility Management Plan, Philadelphia District, Part XII(C) provides:

> The Corps may allow the use of Government disposal area under Section 401(C) of the FWPCA amendments of 1972 (PL 92-500, 33 USCA 1341).  However, the government is required to extend the life of the containment facilities under Section 148 of PL 94-587.  Each request for use of the containment facility will be evaluated individually, however, only material from areas adjacent to a particular navigation project will be considered. Def.'s Ex. Tab A.

33 U.S.C. § 1341 provides:

> In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.  33 U.S.C. § 1341.

David J. Olson ("Olson"), the Assistant Chief of the Operations Division for the Philadelphia District of the Army Corps of Engineers, oversees and supervises the Army Corps' "operational and maintenance activities with regard to all forms of drainage into the Delaware River."  Olson Decl. ¶¶ 1-2.  According to Olson, there are no controlling Army Corps rules, regulations or laws that dictate or specify what actions if any are to be taken in dealing with unauthorized entries into the PCF, or with the condition of the roads within it.  Id. ¶ 11.  Thus, these matters are left to the discretion of the Army Corps.  Id.  Furthermore, there has never been any funding in the Philadelphia District's annual budgets for making improvements to the PCF's roads such as erecting permanent roadside lighting, guardrails, traffic control signs or speed control devices. Id. ¶ 12.

Olson maintains that "[t]he Army Corps ... does not want to do anything, or take any action with regard to the condition of the roads within the PCF, that would encourage their more

16

frequent use by anyone not authorized to be on them.  This is consistent with the Army Corps

requirement that the PCF and other dredge disposal sites be managed in such a way that extends

the storage capacity and useful life of those sites as much and for as long as possible."  Id. ¶ 9.

> Olson avers further that:

> Although Army Corps personnel have become aware at various times that the
> PCF has been intruded upon and used in unauthorized fashion by persons who
> nevertheless enter the facility without permission after it has been closed at the
> end of the normal workday, or on weekends when Army Corps personnel are no
> longer present, I have not been willing to take and therefore have not taken any
> action that would improve the condition of the roads in and around the berms and
> dikes.  I do not wish to encourage a perception that the PCF is available or open to
> recreational use by anyone.  For this reason, earlier in the calendar year 2005, I
> refused a request from an Army Corps employee to undertake limited
> improvement to the interior roads at the facility.   Id. ¶ 10.

According to Olson, the improvements to the PCF's internal roadways suggested by

Plaintiff's Complaint–namely, guard rails, traffic or warning signs, speed control devices, or

lighting–"would be inconsistent with the containment facility management plan that guides the

utilization of the PCF as an extended life facility."  Id. ¶ 12.   Moreover, he defends against such

improvements on the basis of economics and feasibility:

> [S]uch improvements around and on the dikes and berms would be highly
> impractical and costly.  The present road surface consists of the same dredge
> materials that are pumped into the containment areas.  Roads of travel quality
> standards would require extensive excavation, compaction and the importation to
> the site of materials needed for preparation and construction of a suitable subbase.
> However, the ground surface is often not stable enough to support such
> improvements, and is subject to being recontoured during the pumping and
> construction phases of use of the facility.  The roads around and on the dikes and
> berms are themselves subject to being altered or redirected during these activities.
> Once constructed, such a road would have to be monitored and repaired as
> necessary on a regular ongoing basis over the useful life of the PCF.  Nothing
> about the roads or their use is intended for such permanent or semi-permanent use.
> As they are, the roads inside the PCF are acceptable for their intended daytime use
> by Army Corps and contractor vehicles.  Those roads are simply not intended for

darkness overnight recreational use by unauthorized trespassing entrants into the facility.  Id. ¶ 13.

With respect to the first prong of the Berkovitz-Gaubert test, neither party has identified any statute, regulation or policy mandating that the Army Corps maintain or improve the PCF's interior roads in any particular fashion.  The challenged conduct, then, involves an element of judgment or choice and is discretionary under the first prong.  Thus, the inquiry continues to the second prong: whether the judgment is a permissible exercise of policy judgment and is of the type that the FTCA exception is meant to encompass and designed to shield.

There is no dispute that the roadways within the PCF possess no guard rails, traffic or warning signs, speed control devices, or lighting.  According to Olson, the Army Corps chose not to make such improvements because it did not desire to encourage civilian traffic in and around the PCF that had the potential to decrease the life and utility of the facility, which would run contrary to 33 U.S.C. § 419a .  Moreover, even if such improvements had been made, the PCF, given its dangerous operations involving quicksand-like dredge materials, would still pose risks to those civilians.  Olson Decl. ¶¶ 5-6. The ground surface is oftentimes not even stable enough to support such improvements.  Id. ¶ 13.  Finally, such improvements would be costly, and the Army Corps lacked the funding with which to pay for such improvements.  Id. ¶¶ 12-13.  In deciding not to improve the roads or further warn trespassers, the Army Corps balanced the PCF's overall purpose, the funding it possessed, the feasibility of any improvements and the safety of the trespassers.  This line of thinking mirrors that which the Park Service employed in Cope and which satisfied the second prong of Berkovitz-Gaubert.  See Cope, 45 F.3d at 451 (Park Service's decision not to repave a road "require[d] balancing factors such as [the road's]

overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards.").  The Army Corps' decision cannot be characterized as "a mundane, administrative, garden-variety, housekeeping problem" like the one the court found in Gotha, as Plaintiff suggests.

Plaintiff also contends that the "government has not established the requisite nexus between policy and the decision,"  Pl.'s Opp. Br. at 19.  However, this Court disagrees.  As stated above, the Army Corps' decision not to improve the roads within the PCF is grounded in § 419a's mandate that the Corps extend the life of the facility, the lack of funding to pay for such improvements, and the Corps' desire to keep trespassers off of the premises.  Another of Plaintiff's arguments is that dredging is the mission of the Army Corps at the PCF and the maintenance of the access roads within the PCF are analogous to the stairs in Gotha because they are "required for employees on site to pursue the stated mission" but are not the mission itself.  Pl.'s Opp. Br. at 18.  However, as Olson declares, the conditions of the roads have a great effect upon dredging operations.  Olson Decl. ¶¶ 12-13.[1]

Plaintiff further argues that the policy reasons Defendant "attempt[s]" to provide "fail to show any pre-accident evidence that public policy considerations were applied to this decision."  Pl.'s Opp. Br. at 19.  According to Gaubert, the focus of the inquiry is not on the agent's

---

[1]Plaintiff also notes that Olson "was an employee at the site for only four months at the time of [McCaffery's] accident." Pl.'s Opp. Br. at 4, and thus questions the basis of Olson's knowledge of the Army Corps' policies at the PCF.  However, the Court is satisfied that Olson, who declares that he has "been a civilian employee of the Army Corps for over 34 years, 32 of which have been spent assigned to the Philadelphia District" and is "fully familiar with the Army Corps' current and previous, activities and practices," Olson Decl. ¶ 2, is qualified and competent to testify as to the Army Corps and the PCF policies and manner of operations.

subjective intent in exercising discretion, but on the nature of the actions taken or inaction and on whether they are susceptible to policy analysis. Gaubert, 499 U.S. at 325. There is no doubt that 33 U.S.C. § 419a, a law enacted in 1976, requires the Army Corps to "utilize such management practices as [it] determines appropriate to extend the capacity and useful life of dredged material disposal areas such that the need for new dredged material disposal areas is kept to a minimum." 33 U.S.C. § 419a. Furthermore, Olson avers that Army Corps was aware that the PFC had been intruded upon but deliberately chose not to take "any action that would improve the condition of the roads in and around the berms and dikes." Olson Decl. ¶ 10. The Court finds that Olson's testimony, coupled with 33 U.S.C. § 419a, is sufficient evidence of pre-accident discretion.

Plaintiff also argues that "routine operational decisions regarding the maintenance of existing roads and improvements are outside the scope of the discretionary function exception." Pl.'s Opp. Br. at 10-11. Indeed, courts once interpreted Dalehite v. United States, 346 U.S. 15 (1953) to preclude application of the discretionary function exception to acts of negligence occurring at the "operational" level of government as opposed to the "policy" or "planning" level of government. See, e.g., Howard Routh & Sons v. United States, 668 F.2d 454, 457-58 (10th Cir.1981) (distinguishing "operational negligence" from "discretionary functions"); see also Santana-Rosa v. United States, 335 F.3d 39, 43 (1st Cir.2003) (explaining that for the first forty years after the FTCA's enactment, an application of the discretionary function exception depended on whether the conduct occurred at a planning stage rather than the operational level). In subsequent decisions, however, the Supreme Court foreclosed the distinction between high-level policy setting and low-level operational decisions. See United States v. Gaubert, 499 U.S. 315, 325 (1991) ("Discretionary conduct is not confined to the policy or planning level."); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813

20

(1984) (discretionary function exception turns on the "nature of the conduct rather than the status of the actor").  Therefore, the operational-policy distinction Plaintiff argues is no longer viable and the pre-Gaubert cases upon which she relies in support thereof are inapposite.  Furthermore, while Plaintiff cites several decisions holding the discretionary-function exception to be inapplicable to maintenance failures, these cases are largely distinguishable based on the absence of any evidence of an underlying policy judgment.

Plaintiff also argues that even if the Court finds the "Army Corps engaged in a policy decision to keep trespassers out of the facility, the evidence presented suggests that they did not act reasonably [under] the circumstances."  Pl.'s Br. at 20.  However, "[i]f governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States ... acted negligently."  U.S. Fidelity & Guar. Co. v. U.S., 837 F.2d 116, 120 (3d Cir. 1988); see also Lopez v. U.S., 376 F.3d 1055, 1057 (10th Cir. 2004) ("[T]he question of negligence is irrelevant to the applicability of the discretionary function exception."); Whisnant v. U.S., 400 F.3d 1177, 1185 (9th Cir. 2005) ("[T]he question of whether the government was negligent is irrelevant to the applicability of the discretionary function exception[;] the question of how the government is alleged to have been negligent is critical." (internal citation omitted) (emphasis in original)); Ochran v. U.S., 117 F.3d 495, 504 n. 5 (11th Cir. 1997) (Negligence issues "are not relevant considerations for the purpose of resolving the question at issue here, namely whether [the alleged negligence] falls within the discretionary function exception to the FTCA and thus deprives the district court of subject matter jurisdiction.").  Moreover, there is no requirement that the government take any action in order to be protected; if governmental inaction constitutes the exercise of protected discretion, the United States is immune from suit.  Cestonaro v. U.S., 211 F.3d at 753.

Finally, Plaintiff argues that the government's motion for summary judgment is premature and has invoked <u>Fed. R. Civ. P.</u> 56(f), which provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

This Rule provides for the more just adjudication of disputes by ensuring that parties are not " 'railroaded' by a premature motion for summary judgment." <u>Celotex</u>, 477 U.S. at 326 (noting summary judgment not premature because parties had conducted discovery and the action had been ongoing for a year prior to petitioner's motion).

The affidavit should specify "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." <u>Pastore v. Bell Telephone Co.</u>, 24 F.3d 508, 511 (3d Cir.1994) (quoting <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 140 (3d Cir.1988)). Where the plaintiffs establish that the evidence to support their theory is "in the hands of defendants ... summary judgment should not be granted without affording plaintiffs an opportunity for discovery on the issue of concerted action." <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 444 (3d Cir.1977).

Here, Plaintiff's attorney, Matthew McCrink, Esq., has filed a declaration in which he identifies the particular evidence he is seeking.  Specifically, he declares that is necessary for him to depose Gary Moore, Chief of the Pedricktown/Logan Fire and Rescue Squad, regarding 1) any fire and/or rescue operations that occurred at the PCF, 2) any discussions he had with government employees at the PCF, 3) any incidents of injury and/or death at the PCF, 4) any policies in place addressing civilian access to the PCF, and 5) any policies created and/or actions

22

taken in response to civilian injuries and/or deaths at the PCF.  McCrink Decl. ¶¶ 1-4.  He also declares that it is necessary to depose Kenneth Oliver[2] of the fire and rescue section of the Pedricktown/Logan Fire and Rescue Squad regarding any incidents of injury and/or death at the PCF and any policies created and/or actions taken in response to civilian injuries and/or deaths at the PCF.  Id. ¶¶ 5-6.  Finally, he declares that the policies and procedures for securing and maintaining the PCF and maintaining the roads within the PCF "have not yet been determined" because he has not yet deposed PCF employees and needs to do so in order to discover such information.  Id. ¶¶ 7-8.

The government argues, and the Court agrees, that if Moore or Oliver were to testify as to PCF policies and procedures and the bases of such testimony were conversations that they had with PCF employees, those comments from PCF employees would be out-of-court statements offered for their truth and would constitute hearsay which would be inadmissible at trial.  Fed. R. Evid. 801(c).  The Court cannot consider hearsay statements that would be inadmissible at trial on a motion for summary judgment.  Philbin v. Trans Union Corp., 101 F.3d 957, 961 n. 1 (3d Cir.1996).  Moreover, to the extent that the potential testimony of Moore or Oliver were to involve prior accidents that occurred at the PCF, such testimony would be probative of whether the Army Corps acted negligently by failing to improve the roads in light of prior accidents.  However, as stated earlier, "[i]f governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States ... acted negligently."  U.S. Fidelity & Guar. Co., 837 F.2d at 120.  Therefore, such testimony would also be insufficient to forestall summary judgment at this juncture.

---

[2]Plaintiff's counsel does not proffer any reason why he was unable to obtain affidavits or certifications from these individuals in opposition to this motion.

Additionally, while Mr. McCrink declares that the policy and procedures for securing and maintaining the PCF and maintaining the roads within the PCF "have not yet been determined," McCrink Decl. ¶¶ 7-8, the government, in connection with this motion, produced the relevant portions of the Philadelphia District Containment Facility Management Plan and indicated that the Army Corps' safety program could be located quite easily on the Internet.  Furthermore, as stated earlier, Olson declares there are no controlling Army Corps rules, regulations or laws that dictate or specify what actions if any are to be taken in dealing with unauthorized entries into the PCF, or with the condition of the roads within it, Olson Decl. ¶ 11, and Plaintiff has not uncovered such regulation or laws.  Ultimately, the wisdom of the government's decision to not improve the interior roads within the PCF is not the inquiry; rather, the issue is whether that type of decision was a permissible exercise of policy judgment and the type the FTCA exception was meant to encompass.  That determination can be made on this record, and the Court does not find that Plaintiff requires discovery on this issue.

In sum, the Court finds that the discretionary function exception to the FTCA applies here, and thus, any alleged negligence on the part of the Army Corps is irrelevant to this inquiry. Therefore, the United States is immune from this suit pursuant to the discretionary function exception to the FTCA, and this Court lacks jurisdiction.

**B.  Applicability of the New Jersey Landowners' Liability Act**

The United States also argues that it is immune pursuant to the New Jersey Landowners' Liability Act ("LLA"), N.J.S.A. §  2A:42A-3(a):

> An owner, lessee or occupant of premises, whether or not posted as provided in
> section 23:7-7 of the Revised Statutes, and whether or not improved or maintained
> in a natural condition, or used as part of a commercial enterprise, owes no duty to
> keep the premises safe for entry or use by others for sport and recreational

activities, or to give warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes.  N.J.S.A.  §  2A:42A-3(a).

The LLA defines "sport and recreational activities" to include "hunting, fishing, trapping, horseback riding, training of dogs, hiking, camping, picnicking, swimming, skating, skiing, sledding, tobogganing, operating or riding snowmobiles, all-terrain vehicles or dirt bikes, and any other outdoor sport, game and recreational activity including practice and instruction in any thereof." N.J.S.A.  §  2A:42A-2.  So long as a particular activity  is sporting or recreational within the meaning of the LLA, the activity need not be specifically delineated within the LLA in order to confer immunity upon the landowner.  See Weber v. United States, 991 F. Supp. 694 (D.N.J. 1998) (finding that swinging on a swingset was recreational under the LLA). Immunity under the LLA does not extend to owners or occupants of land located "in residential and populated neighborhoods," Harrison v. Middlesex Water Co., 80 N.J. 391, 397 (1979), but was intended to provide immunity for "undeveloped, open and expansive rural and semi-rural properties." Id. at 400; see also Labree v. Millville Mfg., Inc., 195 N.J. Super. 575, 581 (App. Div.1984) (reiterating the principles set forth in Harrison).  The parties do not dispute that the PCF constitutes a semi-rural area.

The United States contends that the LLA applies and that it is therefore entitled to immunity pursuant to its provisions. Specifically, it argues that the LLA applies here because McCaffery's socializing or partying on the PCF was a recreational activity covered by the LLA. Plaintiff argues that the LLA is inapplicable by virtue of N.J.S.A. §  2A:42A-4, which provides that LLA shall not limit the liability which would otherwise exist for willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity.  N.J.S.A. § 2A:42A-4.

Plaintiff cites to Krevics v. Ayars, 141 N.J. Super. 511 (Law Div.1976) in support of her contention that the Army Corps willfully failed to guard against a known dangerous condition. In Krevics, the defendant had caused a cable to be placed across a motorbike trail on his property with the express intent of keeping others off the trail.  The plaintiff, who had used the trail before, was injured when his motorbike struck the cable.  The trial judge denied defendant's motion for summary judgment, holding, among other things, that defendant would be required to respond in damages if he willfully or maliciously erected a hazardous condition and plaintiff was injured as a result thereof. Krevics,141 N.J. Super. at 517.  Here, the Army Corps sought to prevent unauthorized access to the PCF and erected signs warning trespassers of the dangers therein.  There is no evidence from which it could be inferred that the Army Corps "willfully or maliciously" failed to guard against a known dangerous condition.

Plaintiff also points to Nazzaro v. U.S., 304 F. Supp.2d 605, 620-21 (D.N.J. 2004) as support for the proposition that a requirement for immunity under the LLA is that owners/lessees or occupants give permission for others to use the property.  The government contends that the Court should ignore that proposition from Nazzaro because the proposition has no support in the statute itself or in any other case.

The parties read Nazzaro too broadly.  In Nazzaro, the plaintiff was part of a group that had been given a license to use an obstacle course at a Fort Dix, New Jersey army base and was injured when he fell off of a particular obstacle.  Nazzaro, 304 F. Supp.2d at 607-08.  Therefore, unlike this case, Nazzaro involved subsection (b) of N.J.S.A.  § 2A:42A-3, which provides:

> An owner, lessee or occupant of premises who gives permission to another to enter upon such premises for a sport or recreational activity or purpose does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty

of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted. N.J.S.A. § 2A:42A-3(b)

It is clear from the text of N.J.S.A. § 2A:42A-3(b) that permission to use the property is a requirement for immunity under section (b). Thus, when Judge Irenas wrote in Nazzaro that a requirement for immunity under the LLA is that owners/lessees or occupants give permission for others to use the property, he was referring to the subsection relevant there, subsection (b) of the LLA, and not to the LLA as a whole. Therefore, Nazzaro cannot save Plaintiff's case, either.

The Court finds 1) that the activities of socializing and partying are analogous to picnicking and camping within the ambit of the LLA, 2) that since the LLA applies to persons who enter onto property for sport and recreational activities then it must also apply when those persons exit from the property, and 3) that PCF is a semi-rural area. Therefore, the United States is also immune from suit pursuant to N.J.S.A. § 2A:42A-3.

### III.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted. An appropriate Order will follow.

Date: June 7, 2006

S/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge

27